**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| ETH IS MONEY CHANGE MY MIND, LLC, <br><br> Plaintiff, <br><br> v. <br><br> ATLANTIC AVIATION FLIGHT SUPPORT, INC.; ATLANTIC AVIATION CORPORATION; ATLANTIC AVIATION NORTH AMERICA 2 INC.; and ATLANTIC AVIATION SERVICE INC. <br><br> Defendants. | No._____ |

**COMPLAINT**

Plaintiff ETH IS MONEY CHANGE MY MIND, LLC, ("ETH") by and through undersigned counsel, states as follows for its complaint against Defendants Atlantic Aviation Flight Support, Inc.; Atlantic Aviation Corporation; Atlantic Aviation North America 2 Inc.; and Atlantic Aviation Service Inc (collectively and interchangeably "Atlantic PHL"), for damage to ETH's aircraft that occurred while parked at Atlantic PHL's facility at Philadelphia International Airport:

**PARTIES**

1.      Plaintiff ETH IS MONEY CHANGE MY MIND, LLC, ("ETH") is a Florida limited liability company that has its principal place of business located in Martin County, Florida.

2.      Upon information and belief, Defendant Atlantic Aviation Flight Support, Inc., is a Delaware corporation with a principal business address of 5525 Granite Parkway, Suite 1700,

1

Plano, TX 75024, or 5201 Tennyson Parkway, Plano TX 75024, and was formerly named Atlantic Aviation PHL, Inc.

3. Upon information and belief, Defendant Atlantic Aviation Flight Support, Inc., holds fictitious name registrations with the Pennsylvania Department of State for "Atlantic Aviation Services" and "Atlantic Aviation," both with a principal address of 8375 Enterprise Avenue, Philadelphia, PA 19153.

4. Upon information and belief, Atlantic Aviation Corporation is an active Pennsylvania domestic corporation with a registered office of CT Corporation System in Philadelphia.

5. Upon information and belief, Atlantic Aviation North America 2 Inc. is a Delaware corporation with a principal address of 5525 Granite Parkway, Suite 1700, Plano, TX 75024, licensed to do business in Pennsylvania, with a registered office of CT Corporation System in Philadelphia.

6. Upon information and belief, Atlantic Aviation North America 2 Inc. is an "interested entity" in a fictitious name registration with the Pennsylvania Department of State for "Atlantic Aviation."

7. Upon information and belief, Atlantic Aviation Service, Inc. is a Delaware corporation registered to do business in Pennsylvania with a registered office of The Philadelphia International Airport, Philadelphia, PA.

8. A "fixed based operator" or "FBO" does business under the name "Atlantic Aviation" at a facility at the Philadelphia International Airport to provide aircraft storage, maintenance, refueling, and related services; this facility is referred to in this complaint as the "PHL Facility."

2

9. Since the operator of the PHL Facility does business merely as "Atlantic Aviation," ETH is unable to precisely identify the business entity or entities responsible for the PHL Facility and therefore alleges upon information and belief that the PHL Facility is owned and/or operated, in whole or in part, individually or collectively by Defendants Atlantic Aviation Flight Support, Inc.; Atlantic Aviation Corporation; Atlantic Aviation North America 2 Inc.; and Atlantic Aviation Service, Inc., who are referred to collectively and interchangeably in this Complaint as "Atlantic PHL."

## JURISDICTION AND VENUE

10. The Court has diversity jurisdiction over this matter under 28 U.S.C. § 1332 because the amount in controversy is in excess of $75,000 and there is complete diversity of citizenship Plaintiffs and Defendants; Plaintiff is a Florida limited liability company, and Defendants are Delaware and Pennsylvania corporations.

11. Venue in this Court is appropriate under 28 U.S.C. § 1391 because the events underlying this suit substantially occurred at Philadelphia International Airport and concern property that is currently located at Philadelphia International Airport, within the Eastern District of Pennsylvania.

## FACTS COMMON TO ALL COUNTS

12. ETH owns a 2014 Dassault Aviation Model Falcon 7X (the "Aircraft") bearing serial number 219 and registration number N711PV with the United States Federal Aviation Administration.

13. In mid-March 2026, one of ETH's pilots called the PHL Facility to inquire if a reservation would be needed to park the Aircraft at the PHL Facility during an upcoming trip to Philadelphia on March 20, 2026.

14.     An Atlantic PHL customer service representative informed the ETH pilot that no reservation was necessary.

15.     The ETH pilot did not inquire about pricing for parking at the PHL Facility because he had prior experience with Atlantic Aviation's pricing and payment procedures.

16.     While ETH signed a "Use and Occupancy Agreement" that provided for use of hangar space in Florida with SUA FL Holdings, LLC, that does business at "Atlantic Aviation", ETH currently lacks any basis to conclude that Atlantic PHL and SUA FL Holdings, LLC, are sufficiently related for the "Use and Occupancy Agreement" to have any relevance here.

17.     On March 20, 2026, two ETH pilots flew the Aircraft from Florida to Philadelphia International Airport (PHL), with a flight attendant and 10 passengers on board.

18.     After taxiing to the PHL Facility, the Aircraft offloaded its passengers, and an Atlantic PHL employee directed ETH's pilots to park the Aircraft at a specific location on the PHL Facility's "ramp"—an area of tarmac controlled by Atlantic PHL.

19.     Based on industry practice and prior dealings with Atlantic Aviation, ETH's pilots understood that they were required to leave the Aircraft in a condition that would allow Atlantic PHL to tow the Aircraft to a different parking location as needed to accommodate other aircraft.

20.     ETH's pilots therefore left the Aircraft's brake off and pinned the landing gear into an open position that would allow the Aircraft to be towed by Atlantic PHL as needed.

21.     ETH's pilots and flight attendant then left the Aircraft on the PHL Facility's "ramp."

22.     The "ramp" where the Aircraft was located could only be accessed through a locked door that could be opened only by an Atlantic PHL employee.

4

23.    The next day, March 21, 2026, the Aircraft was unoccupied and parked in the same position at the PHL facility when an Atlantic PHL employee approached it driving a four-wheel, approximately 16,000-pound motorized "tug" at a very high speed.

24.    Based on statements made to ETH's pilots by Atlantic PHL employees, ETH alleges upon information and belief that the Atlantic PHL employee driving the tug was a man known as "Drew" to his co-workers whose legal first name was John; he is referred to in this Complaint as Drew.

25.    Upon information and belief, Drew was known to his co-workers as an error-prone and accident-prone worker who had recently returned to work after recuperating from injuries he sustained while playing basketball at the PHL Facility during work hours.

26.    Upon information and belief, on another occasion, Drew injured himself after jumping to the ground from the top of the entry stairs to an aircraft, from a height of about six feet.

27.    On March 21, 2026, Drew drove the tug past the Aircraft at high speed and then turned suddenly, creating centrifugal forces that threw him off the tug with enough force to cause him to be thrown several feet clear of the tug before hitting the ground.

28.    The unoccupied tug continued to turn, leading it to execute a U-turn and collide with the Aircraft's port wing, where it came to a stop.

29.    Security cameras captured this entire sequence of events from two angles.

30.    The collision damaged the wing so severely that it punctured a fuel tank in the wing, creating a large enough leak that when ETH's pilots arrived after receiving notice from Atlantic PHL, one of them recommended calling a tanker truck to remove the Aircraft's fuel because the 55-gallon drum then in-place would be insufficient to contain the leak.

31.    Security cameras captured footage of the errant turn, the resulting collision with the Aircraft, and the ensuing fuel leak from two angles.

32.    The tug was traveling at such an excessive speed that the video shows when it hit the Aircraft's wing it actually caused the Aircraft to move, even though the Aircraft, with its fuel, weighed over 50,000 pounds.

33.    Upon information and belief, the tug was owned or otherwise controlled by Atlantic PHL, Drew was acting at all relevant times within the scope of his usual job responsibilities with Atlantic PHL, and Drew was operating the tug with the express or implied permission or direction of Atlantic PHL management.

34.    Drew reported the collision to a supervisor employed by Atlantic PHL.

35.    Subsequent inspections determined that the damage to the wing was so extensive that it could not be repaired, and that the wing would need to be replaced.

36.    In its damaged state, the Aircraft did not meet the U.S. Federal Aviation Administration's ("FAA") airworthiness standards and could not be flown.

37.    In addition, while the FAA sometimes issues special permits for aircraft that fail to meet airworthiness standards to fly for the specific purpose of being ferried to a different location for repairs, Dassault Falcon Jet—the manufacturer of the Aircraft—determined that it would not be cost-effective to ferry the Aircraft to one of the manufacturer's facilities because the costs of performing a temporary fix for a ferry flight far exceeded the projected additional costs associated with replacing the Aircraft's wing at the PHL Facility.

38.    On May 4, 2026, Dassault Falcon Jet provided ETH with a quote of over $5.4 million for replacement of the damaged wing, with some of the costs attributable to the need to

6

ship parts and dispatch technicians to the PHL Facility, instead of performing the work at one of the manufacturer's facilities, since the Aircraft is unflyable.

39.     When the Aircraft arrived in Philadelphia, it was approaching a calendar-based deadline for an extensive regular inspection, which is now expected to be performed at additional cost at the PHL Facility instead of at a usual inspection location.

40.     While ETH has cancelled or delayed some trips that otherwise would have been performed with the Aircraft, ETH anticipates that certain trips—including trips to Chicago; Kentucky; California; Washington; and London—will need to be taken during the period the Aircraft is unavailable for repairs.

41.     ETH will now need to substitute for use of the Aircraft by engaging charter aircraft operators at additional expense beyond the costs of operating the Aircraft for these trips.

42.     Based on quotes received from a leading charter aircraft operator, ETH estimates that these flights will now cost nearly $900,000 in total, or about $660,000 more than the costs ETH would otherwise incur to operate the Aircraft for these flights.

43.     As noted below, before the incident occurred, ETH planned to put the Aircraft up for sale relatively soon after its trip to Philadelphia, and ETH acknowledges that it would need to incur costs anyway for alternative transportation after sale of the Aircraft; however, ETH anticipated that it would continue to use the Aircraft—and thus avoid duplicative transportation costs—during the weeks- or months-long period between putting the Aircraft up for sale and actually locating an appropriate buyer.

44.     Just as a car that has been in an accident has a lower resale value, an aircraft that has been damaged suffers a permanent loss in resale value, even after the damage has been repaired.

45.     An appraiser inspected the Aircraft and estimated that even if the wing is replaced with a new wing, the Aircraft will suffer a permanent diminution in value of approximately $3.4 million.

46.     Rather than installing a new wing, Atlantic PHL's insurer has raised the issue of installing a used wing.  This is unacceptable because installation of a used wing will result in further reduction in the resale value of the Aircraft and is likely to result in additional technical issues, which would include the absence of a manufacturer warranty on the replacement wing.

47.     ETH also anticipates that as a result of being left stationary for an extended period of time, additional inspections and/or repairs might foreseeably become necessary as a result of the deterioration of components from prolonged disuse.

48.     ETH currently estimates its total damages for the costs of repair, alternate flight arrangements, and lost value of the Aircraft at approximately $9.5 million, with the possibility that these damages will grow depending on whether additional damage is discovered once repairs commence and the length of time the Aircraft remains idle and therefore requires additional alternative flight arrangements and/or additional inspections and repairs resulting from disuse.

49.     ETH has demanded that Atlantic PHL cover the costs of replacing the Aircraft's wing and pay for the diminution in value; however, Atlantic PHL has not yet agreed to do so.

50.     As of the date of this filing, the Aircraft remains at the PHL facility, unable to fly and awaiting replacement of the wing.

51.     If Atlantic PHL continues to delay in issuing payment for the diminution of value of the Aircraft, ETH will be entitled to pre-judgment interest on the sum due to it for diminution of value.

52. In addition, prior to this incident, after the trip to Philadelphia, ETH intended to put the Aircraft up for sale and had discussed the possibility of sale with its three full-time pilots and one full-time mechanic before the Aircraft was damaged.

53. ETH had planned to sell the Aircraft once the extensive calendar-based inspection was completed and has informed its employees that it still intends to sell the Aircraft once it is airworthy again.

54. ETH, however, could not predict the timeline for locating a buyer and ultimate sale of the Aircraft and intended to retain its pilots and mechanic until the Aircraft was sold, so as to avoid incurring duplicative costs for alternate transportation while also incurring costs for the storage and maintenance of the Aircraft.

55. In addition, ETH intended to retain its pilots and mechanic to assist in the sale of the Aircraft, including by properly maintaining it through sale and having pilots available to demonstrate the Aircraft for potential buyers.

56. Now, to ensure that it has the necessary personnel to effectuate the sale of the Aircraft, ETH has continued to pay pilots and a mechanic with nothing to do while the Aircraft remains grounded at the PHL Facility.

57. Thus, as a result of Atlantic PHL's actions in causing and/or permitting damage to the Aircraft, ETH has also suffered damages in the form of additional labor costs above what would have been reasonably anticipated if ETH had been able to put the Aircraft up for sale immediately following the completion of inspections.

58. In addition, since the sale of the Aircraft will be delayed compared to a scenario in which the Aircraft had not been damaged and grounded for an extended period of time, ETH will

9

not be fully compensated for its losses without receiving pre-judgment interest on the resale value of the Aircraft.

**COUNT I – BREACH OF IMPLIED BAILMENT CONTRACT**

59.     The allegations of the preceding paragraphs are incorporated into this count as if fully set forth here.

60.     "A bailment is a delivery of personalty for the accomplishment of some purpose upon a contract, express or implied, that after the purpose has been fulfilled, it shall be redelivered to the person who delivered it, otherwise dealt with according to his directions or kept until he reclaims it." *Ockley v. Radnor Twp.*, 802 F. Supp. 3d. 743, 764 (E.D.Pa. 2025) (quoting *Smalich v. Westfall*, 269 A.2d 476, 480 (Pa. 1970))

61.     "To constitute bailment, there must be a delivery of personal property to another, who accepts possession of the property, and exercises custody and control over it. While a contract of bailment may be implied, such contract can arise only when the natural and just interpretation of the acts of the parties warrants such a conclusion." *Charlie v. Erie Ins. Exch.*, 100 A.3d 244, 253 (Pa. Super. 2014) (quoting *Riggs v. Com., Dept. of Transp.*, 463 A.2d 1219, 1220-21 (Pa. Commw. 1983)).

62.     Here, ETH delivered personal property, the Aircraft, to Atlantic PHL.

63.     Atlantic PHL accepted possession of the Aircraft through acts that included directing the Aircraft to a parking spot on the PHL Facility's "ramp."

64.     Atlantic PHL exercised custody and control over the Aircraft because, for example, it kept the Aircraft behind a locked door that could only be opened by Atlantic PHL employees, and Atlantic PHL had the right and ability to tow the Aircraft to a different location if necessary to accommodate other aircraft.

10

65.     Although ETH retained sole ability to access the interior of the Aircraft, custody and control do not need to be exclusive to create a bailment. *See, e.g., English Whipple Sailyard, Ltd. v. Yawl Ardent*, 459 F. Supp. 866, 874 (W.D.Pa. 1978) (holding that bailment existed when bailor and bailee both had keys to boat). Moreover, the entire time the Aircraft was in Atlantic PHL's possession, it was able to move the Aircraft, as it did not need access to the interior of the Aircraft to move it.

66.     Atlantic PHL therefore accepted delivery of the Aircraft into its possession and exercised sufficient custody and control over the Aircraft to establish an implied bailment, particularly in light of industry practice and the course of dealing between ETH and Atlantic Aviation that led them to understand that ETH would make payment upon departure for the parking services provided by Atlantic PHL.

*67.*     "In a mutual benefit bailment…the bailee is entitled to compensation if he/she gives adequate notice of the intention to charge the bailor." *Johnson v. Mathia*, 526 A.2d 404, 405 (Pa. Super. 1987) (citing *Ferrick Excavating and Grading v. Senger Trucking*, 461 A.2d 800, 802 (Pa. Super. 1983), *rev'd on other grounds*, 484 A.2d 744 (Pa. 1984)).

68.     Since ETH and Atlantic PHL mutually understood based on industry practice and course of dealing that ETH would pay Atlantic PHL for parking upon departure, the bailment here was one of mutual benefit in which ETH was supposed to receive the benefit of a safe location to keep the Aircraft, and Atlantic PHL was supposed to receive the benefit of payment in return.

69.     "Where the allegations of a bailment indicate a bailment for mutual benefit, the bailee is required to exercise ordinary diligence and is responsible for ordinary neglect." *Lear*

11

*Inc. v. Eddy*, 749 A.2d 971, 974 (Pa. Super. 2000) (citing *Price v. Brown*, 680 A.2d 1149, 1152 n.2 (Pa. 1996)).

70.    As a bailee in possession of the Aircraft for the mutual benefit of ETH and Atlantic PHL, Atlantic PHL therefore had a duty to exercise reasonable care in protecting the Aircraft from damage or loss.

71.    Atlantic PHL had a duty under a bailment for mutual benefit to protect the Aircraft from the tortious acts of third parties *and* from its own employees, including tortious acts committed outside the scope of employment that would fall outside the scope of Atlantic PHL's vicarious liability. *See e.g., Jackson v. Fort Pitt Hotel*, 57 A.2d 696, 697 (Pa. Super. 1948) ("If the defendant was under an absolute duty as to the bailed car, it makes no difference whether the defendant's own servant wrongfully took the car and injured it, or whether the defendant failed properly to guard against a third party doing so."); *Metzger v. Downtown Garage Corp.*, 82 A.2d 507, 508 (Pa. Super. 1951) (holding that "the doctrine of respondeat superior cannot be invoked to relieve any bailee of his liability…even though such employee was acting for his own purposes, without authority or contrary instructions, and not withstanding the bailee's own freedom from negligence in his selection and retention"); *Fishman Org., Inc. v. Frick Transfer, Inc.*, Civil Action No. 11-4598, 2012 WL 3030170, at \*4 (E.D.Pa. July 25, 2012) (citing and discussing *Jackson* and *Metzger*).

72.    Under Pennsylvania law, a bailee's failure to return the bailed property in an undamaged state (or at all) creates a *prima facie* claim that gives rise to a presumption that the bailee failed to exercise ordinary care in protecting the bailed property, placing the burden on the bailee to produce an account of the loss or damage to the bailed property that does not show its own negligence. *Hearst Magazines, Div. of Hearst Corp. v. Cuneo Eastern Press, Inc. of Pa.*, 296

12

F. Supp. 1202, 1204 (E.D.Pa. 1969); *Schell v. Miller N. Broad Storage Co.*, 16 A.2d 680, 681 (Pa. Super. 1940); *Dolan Mech., Inc. v. Thackray Crane Rental, Inc.*, Civil Action No. 21-3020, 2022 WL 3452747, at *3 (E.D.Pa. Aug. 18, 2022) (citing cases including *Hearst Magazines* and *Schell*).

73.     Since Atlantic PHL failed to return the Aircraft to ETH's possession in an undamaged state, ETH has a *prima facie* claim for breach of an implied bailment contract for mutual benefit.

74.     To the extent that the Court might find it necessary for ETH to make any further specific allegations concerning Atlantic PHL's failure to exercise reasonable care with regard to its bailment obligations, ETH alleges—separately from those acts of negligence or gross negligence alleged elsewhere in this Complaint—that Atlantic PHL failed to exercise reasonable care in protecting the Aircraft from damage when it failed to create and/or enforce appropriate policies and procedures for the safe operation of tugs, including policies concerning the selection, supervision, and training of personnel entrusted with operation of tugs, thus creating an unreasonable risk of unsafe tug operation that resulted in the collision with the Aircraft.

75.     As a proximate result of the collision with the Aircraft's wing, ETH has suffered damages that include (1) the costs of replacing the damaged wing, (2) the permanent reduction in value of the Aircraft that will remain even after the wing is replaced, (3) the costs of substitute transportation in excess of the costs that would be incurred by operating the Aircraft, and (4) various additional costs for inspection and repair resulting or potentially resulting from the immobility and disuse of the Aircraft.

WHEREFORE, ETH respectfully requests that the Court enter judgment in its favor and award ETH money damages for repair costs, diminution of value, additional costs of alternative

flight arrangements, additional inspection and repair costs related to the immobility and disuse of the Aircraft, and additional labor costs—estimated to collectively exceed $9.5 million—together with pre-judgment interest and whatever further or alternative relief the Court deems just and proper.

**COUNT II – BREACH OF CONTRACT IMPLIED IN FACT (IN THE ALTERNATIVE)**

76.     The allegations of the preceding paragraphs are incorporated into this count as if fully set forth here.

77.     In the alternative, if the Court finds that no bailment contract existed, then the actions of ETH and Atlantic Aviation created an implied-in-fact licensor-licensee contract that permitted ETH the use of parking space on the ramp.

78.     Pennsylvania courts have held in the context of automobile parking that even when a bailment contract does not exist, a parking lot operator may assume an implied contractual duty to safeguard automobiles on the premises on the basis of a licensor-licensee relationship with their patrons. *Sparrow v. Airport Parking Co. of America*, 289 A.2d 87, 91-92 (Pa. Super. 1972).

79.     An implied-in-fact contract may be created under Pennsylvania law that has the same effect and validity as a written contract. *Atlantic States Ins. Co. v. Copart, Inc.*, 609 F. Supp. 3d 379, 390 (E.D.Pa. 2022).

80.     Actions that created an implied-in-fact contract between Atlantic PHL include the phone call in which Atlantic PHL informed ETH that no reservation was needed, Atlantic PHL's acceptance and direction of the Aircraft to a parking location at the PHL facility, and ETH and Atlantic PHL's understanding based on industry practice and course of dealing that ETH would render payment for parking at the PHL Facility upon departure.

14

81. By controlling access to the PHL Facility's "ramp" with a locked door that could only be opened by an Atlantic PHL employee, Atlantic PHL implicitly assumed the duty as part of its contract with ETH to reasonably safeguard the Aircraft from damage that could be inflicted by people on the "ramp."

82. It was also, or in the alternative, implied through industry practice and the course of dealing between ETH and Atlantic Aviation that Atlantic PHL assumed the responsibility to reasonably safeguard the Aircraft from damage or theft.

83. For example, Atlantic Aviation advertises on a webpage for the PHL Facility that it has "24-hour surveillance & security."[1]

84. Atlantic PHL and ETH therefore had an implied-in-fact contract based on a shared understanding that Atlantic PHL would provide parking space for and reasonably safeguard the Aircraft in consideration for payment by ETH, with the exact amount of payment to be determined upon the Aircraft's departure from the PHL Facility.

85. Atlantic PHL breached this implied-in-fact contract because it failed to reasonably safeguard the Aircraft when its own employee sent an unoccupied, out-of-control tug careening into the Aircraft's wing.

86. As a result of Atlantic PHL's breach of the implied-in-fact contract by damaging the Aircraft, ETH has suffered direct and consequential damages that include (1) the costs of replacing the damaged wing, (2) the permanent reduction in value of the Aircraft that will remain even after the wing is replaced, (3) the costs of substitute transportation in excess of the costs that would be incurred by operating the Aircraft, and (4) various additional costs for inspection and repair resulting or potentially resulting from the immobility and disuse of the Aircraft.

---

[1] https://www.atlanticaviation.com/locations/PHL (accessed May 25, 2026)

WHEREFORE, ETH respectfully requests that the Court enter judgment in its favor and award ETH money damages for repair costs, diminution of value, additional costs of alternative flight arrangements, additional inspection and repair costs related to the immobility and disuse of the Aircraft, and additional labor costs—estimated to collectively exceed $9.5 million—together with pre-judgment interest and whatever further or alternative relief the Court deems just and proper.

### COUNT III – NEGLIGENCE/GROSS NEGLIGENCE (VICARIOUS LIABILITY)

87.    The allegations in the preceding paragraphs are incorporated into this count as if fully set forth here.

88.    Separate from any contractual duties Atlantic PHL had to *protect* the Aircraft *from others*, its employee, Drew, had an independent duty in tort to exercise reasonable care in avoiding injury to others' persons and property.

89.    For example, if a third-party aircraft being guided by an Atlantic PHL employee had struck the Aircraft, ETH would have both contractual claims against Atlantic PHL and a tort-based claim against the third-party aircraft's operator.

90.    Similarly, if Drew had happened to crash a tug into the Aircraft on a public ramp while it was taxiing to park at a *different* FBO, ETH would still have a negligence claim against Drew—and Atlantic PHL by extension—even if ETH had no *contractual* relationship with Atlantic PHL.

91.    Here, it is merely coincidental that the person with a tort-based duty—Drew— also happens to be an employee of the entity with a contract-based duty—Atlantic PHL.

92.     Drew breached his duty to exercise reasonable care to avoid damaging the persons or property of others when he maneuvered the tug at excessive speed, causing himself to be thrown from the tug by centrifugal forces.

93.     Drew's maneuvering of the tug at excessive speed directly and proximately caused damage to the Aircraft by sending the tug on an uncontrolled path toward the Aircraft's port wing, causing a collision and significant damage to the Aircraft.

94.     As a proximate result of Drew's breach of his duty of reasonable care, ETH has suffered damages that include (1) the costs of replacing the damaged wing, (2) the permanent reduction in value of the Aircraft that will remain even after the wing is replaced, (3) the costs of substitute transportation in excess of the costs that would be incurred by operating the Aircraft, and (4) various additional costs for inspection and repair resulting or potentially resulting from the immobility and disuse of the Aircraft.

95.     Since Drew was an Atlantic PHL employee and was, upon information and belief, operating the tug with the express or implied permission or direction of Atlantic PHL management as part of his regular job responsibilities, Drew was acting within the scope of his employment with Atlantic PHL when he negligently operated the tug and caused it to collide with the Aircraft.

96.     Atlantic PHL is therefore vicariously liable for the negligent actions of its employee, Drew, in damaging the Aircraft.[2]

97.     Furthermore, Drew's actions rise to the level of gross negligence because his driving of the tug with enough speed and suddenness to *cause himself to be thrown from the tug*

---

[2] Pennsylvania law permits a claim for vicarious liability to be pleaded even without a particular employee named in the complaint. *Estate of Denmark ex rel. Hurst v. Williams*, 117 A.3d 300, 306 (Pa. Super. 2015).

and to cause the tug to *move* the 50,000-pound aircraft upon colliding with it substantially exceeded the degree of carelessness constituting negligence.

98.    Since Drew's job responsibilities, upon information and belief, included driving a tug, his wildly erratic driving of the tug was not outside of his job responsibilities in such an extreme manner as to absolve his employer of vicarious liability.

99.    Thus, Atlantic PHL is also vicariously liable for the *grossly* negligent actions of its employee, Drew, in damaging the Aircraft.

WHEREFORE, ETH respectfully requests that the Court enter judgment in its favor and award ETH money damages for repair costs, diminution of value, additional costs of alternative flight arrangements, additional inspection and repair costs related to the immobility and disuse of the Aircraft, and additional labor costs—estimated to collectively exceed $9.5 million—together with pre-judgment interest and whatever further or alternative relief the Court deems just and proper.

## COUNT IV – NEGLIGENT/GROSSLY NEGLIGENT RETENTION, TRAINING, AND SUPERVISION

100.    The allegations in the preceding paragraphs are incorporated into this count as if fully set forth here.

101.    Atlantic PHL may be found liable for negligent retention, training, and supervision even if Drew had not been acting within the scope of his employment at the time of the collision.

102.    Upon information and belief, Atlantic PHL knew, or reasonably should have known, that Drew had a tendency to engage in careless or reckless behavior based on the reputation he had developed among co-workers as mistake-prone, as well as his history of

workplace injuries that included an injury resulting from the ill-advised decision to jump over six feet from the top of an airplane's entry stairs.

103. Atlantic PHL had a duty to exercise reasonable care in its retention, training, and supervision of Drew so as to prevent his causing harm—whether within or outside the scope of his employment—that was reasonably foreseeable based on knowledge it had, or reasonably should have had, of Drew's dangerous tendencies.

104. Even though it knew, or reasonably should have known, of Drew's tendency to engage in careless or reckless behavior, Atlantic PHL retained Drew as an employee.

105. Even though it knew, or reasonably should have known, of Drew's tendency to engage in careless or reckless behavior, Atlantic PHL failed to provide Drew with sufficient training or retraining in safe workplace practices.

106. Even though it knew, or reasonably should have known, of Drew's tendency to engage in careless or reckless behavior, Atlantic PHL failed to sufficiently supervise Drew to prevent or stop careless or reckless behavior.

107. Based on the knowledge it had or should have had of Drew's tendency to engage in careless or reckless behavior, it was reasonably foreseeable to Atlantic PHL that Drew would engage in behavior—like wildly driving a tug—that would injure persons or property present at the PHL Facility.

108. Atlantic PHL therefore breached its duty to exercise reasonable care with regard to its retention, training, and/or supervision of Drew.

109. Atlantic PHL's breach of its duties with regard to its retention, training, and/or supervision of Drew constitutes not merely negligence but *gross* negligence because, upon information and belief, Drew had an extensive history of careless, even reckless, on-the-job

19

behavior that substantially exceeded the degree at which Atlantic PHL knew, or reasonably should have known, that he had a tendency to engage in careless or reckless behavior that made an incident like the collision here reasonably foreseeable.

110.    As a proximate result of Atlantic PHL's breach of duty, ETH has suffered damages that include (1) the costs of replacing the damaged wing, (2) the permanent reduction in value of the Aircraft that will remain even after the wing is replaced, (3) the costs of substitute transportation in excess of the costs that would be incurred by operating the Aircraft, and (4) various additional costs for inspection and repair resulting or potentially resulting from the immobility and disuse of the Aircraft.

WHEREFORE, ETH respectfully requests that the Court enter judgment in its favor and award ETH money damages for repair costs, diminution of value, additional costs of alternative flight arrangements, additional inspection and repair costs related to the immobility and disuse of the Aircraft, and additional labor costs—estimated to collectively exceed $9.5 million—together with pre-judgment interest and whatever further or alternative relief the Court deems just and proper.

### COUNT V – NEGLIGENT ENTRUSTMENT

111.    The allegations in the preceding paragraphs are incorporated into this count as if fully set forth here.

112.    Based on Drew's history of careless and reckless behavior, Atlantic PHL knew or reasonably should have known that Drew posed an unreasonable risk of harm to persons or property if entrusted with the tug.

113.    Atlantic PHL nonetheless, upon information and belief, permitted or directed Drew to operate the tug, thus creating an unreasonable risk of harm and proximately causing the damages ETH sustained due to the collision of the uncontrolled tug with the Aircraft's wing.

114.    Given Atlantic PHL's knowledge about Drew's past behavior, Atlantic PHL's entrustment of the tug to Drew was *grossly* negligent.

115.    As a proximate result of Atlantic PHL's breach of duty, ETH has suffered damages that include (1) the costs of replacing the damaged wing, (2) the permanent reduction in value of the Aircraft that will remain even after the wing is replaced, (3) the costs of substitute transportation in excess of the costs that would be incurred by operating the Aircraft, and (4) various additional costs for inspection and repair resulting or potentially resulting from the immobility and disuse of the Aircraft.

WHEREFORE, ETH respectfully requests that the Court enter judgment in its favor and award ETH money damages for repair costs, diminution of value, additional costs of alternative flight arrangements, additional inspection and repair costs related to the immobility and disuse of the Aircraft, and additional labor costs—estimated to collectively exceed $9.5 million—together with pre-judgment interest and whatever further or alternative relief the Court deems just and proper.

21

Respectfully Submitted,

**FIELDS HOWELL LLP**

Dated:  May 28, 2026

By:    */s/* John P. Cappel       
        Robert L. Lakind, Esq. (ID No. 208423)
        John P. Cappel, Esq. (ID No. 327744)
        19 West College Avenue, Suite 100
        Yardley, PA 19067
        T: (267) 214-7510 / F: (404) 214-1251
        rlakind@fieldshowell.com
        jcappel@fieldshowell.com
        *Attorneys for Plaintiff*

22